IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

SEDDIQUE MATEEN, On Behalf of Himself and All Others Similarly Situated,

Plaintiff,

vs.

CITRIX SYSTEMS INC., MARK B. TEMPLETON, JOHN P. CUNNINGHAM and EDWARD E. IACOBUCCI

Defendants.

00-6839

CIV-FERGUSON

MAGISTRATE JUDGE SNOW

## PLAINTIFF'S CLASS ACTION COMPLAINT

Plaintiff, by and through his attorneys, allege the following upon the investigation of counsel, except as to those allegations concerning plaintiff, which are alleged upon personal knowledge, including, among other things, the investigation of his attorneys, including without limitation: (a) review and analysis of public filings made by Citrix Systems, Inc. ("Citrix," or the "Company"), with the Securities and Exchange Commission (the "SEC"); (b) review and analysis of securities analysts' reports concerning Citrix; (c) review and analysis of press releases and other publications disseminated by defendants; and (d) other publicly available information about Citrix.



1. This action is brought as a class action on behalf of all persons who purchased the common stock of Citrix from October 18, 1999 through June 9, 2000 (the "Class Period"). Plaintiff's claims arise under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder and pursuant to Section 20(a) of the Exchange Act.

**JURISDICTION AND VENUE**

2. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and pursuant to 28 U.S.C. §§1331 and 1337. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act and present federal questions.

3. Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act and pursuant to 28 U.S.C. §1391(b). At all times relevant to the complaint, the Company maintained its principal executive offices at 6400 Northwest Sixth Way, Ft. Lauderdale, Florida, 33309, in this judicial district. In addition, a substantial number of the false and misleading statements complained of were prepared and disseminated to the investing public from offices within this district.

4. In connection with the violations of law alleged herein, the defendants used the means and instrumentalities of interstate commerce including the United States mail, interstate wire and telephone facilities, the facilities of the national securities markets and the Internet to distribute the false and misleading statements complained of herein.

**PARTIES**

5. Plaintiff purchased shares of Citrix at artificially inflated prices during the Class Period, and have been damaged thereby. Plaintiff's purchases of the Company's common stock are set forth in the accompanying Certifications.

6. Defendant Citrix is an application server software and services provider. The Company markets its software solutions through value-added resellers, system integrators as well as issuing software licenses.

7. Defendant Mark B. Templeton ("Templeton") has, at all material times, been the Company's Chief Executive Officer and President. Defendant Templeton personally prepared and disseminated many of the false and misleading statements complained of herein, and directed the Company's campaign of false and misleading statements regarding its business and operations, as more fully alleged herein.

8. Defendant John P. Cunningham ("Cunningham") has been the Company's Chief Financial Officer since November, 1999. Defendant Cunningham is responsible for signing many of the Company's false and misleading statements filed with the SEC during the Class Period.

9. Defendant Edward E. Iacobucci ("Iacobucci") is the co-founder of the Company and has served as Chairman of the Board since 1991.

**SUMMARY OF ACTION**

10. Citrix, a software developer and licensor, creates software that allows desktop and mobile computers to be run from central server computers. The Company describes itself as a "global leader in application server software and services that offer the ability to run any application over any connection, wireless to Web."

11. During the Class Period, defendants issued a series of public statements touting the Company's "record" financial results. After numerous repeated public announcements emphasizing the Company's success as well as positive analyst reports issuing "BUY" ratings for the Company, Citrix stock soared to over $181 per share on February 10, 2000, and traded at well over $100 a share in March, 2000, after a two-for-one stock split on February 17, 2000.

12. On June 12, 2000, Citrix took investors and analysts by surprise, announcing that the company's financial results for the second quarter of fiscal 2000 would be far from what investors had been led to believe. For the quarter, Citrix announced that it expects to report total revenue in the range of $105 million to $110 million, compared to $94.4 million in the second quarter of 1999. The Company's projected results of 9 to 11 cents per share were in marked contrast to analysts' expectations of 21 cents per share for the quarter. The full extent of the loss is yet unknown to Citrix investors.

13. Defendants attributed the downward revision in a June 12, 2000 press release published on the *Business Wire* to: (a) the transition from traditional "shrink-wrap" boxes to a paper/electronic licensing model which is having a negative impact on revenue growth; (b) the slower than reported expansion of core business within "large enterprise accounts" and (c) the slower than reported expansion of the Company's business in certain markets, including Asia.

14. In response, the price of Citrix common stock fell over 40% to $22 per share - - a far cry from the pre-split Class Period high of nearly $182 per share. Analysts, as well as the investing public, were taken by surprise. For example, analyst Paul Dravis of Banc of America Securities (as reported in a June 12, 2000 article published on *TheStreet.com*), called the Company's communications with investors "atrocious" and told Company executives their credibility was lost. While investors were caught by surprise, defendants had, for some time, been concealing the Company's true financial condition and in fact, had *already* tried to implement cost savings programs. In fact, on June 12, 2000, the Company revealed that it had already initiated a "bottoms up re-look at [Citrix's] headcount."

15. Throughout the Class Period, Defendants made a series of false and misleading statements regarding the financial success and record growth of Citrix, which statements caused Citrix's stock price to be artificially inflated. Those statements appeared in public filings with the SEC and in Citrix press releases. In addition, the misleading representations were disseminated by defendants to the public through press reports and securities analysts' reports as a result of statements defendants made to reporters and securities analysts intending that their misleading statements would be published or otherwise passed on to the public by those reporters and analysts.

## SCIENTER ALLEGATIONS

16. As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements, issued or disseminated by or in the name of defendants or the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Citrix, their control over Citrix's allegedly materially misleading misstatements and/or their control over and close association with the Company which make him privy to confidential information concerning all of Citrix's activities and operations, were active and culpable participants in the fraudulent scheme alleged herein. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. This case does not involve allegations of false forward-looking statements or projections but instead involves false statements concerning Citrix's ongoing activities, central to the Company's business. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of defendants, who were Citrix's top executives and hands-on managers.

17. The defendants also had the motive and opportunity to commit the fraud alleged herein. Defendants' motive to commit fraud: (a) to raise money to fund and protect the continued operations of Citrix, upon which defendants depended for their substantial compensation and prestige; (b) to personally benefit defendants by enhancing the value of their

personal holdings of Citrix common stock; (c) to allow defendants to raise additional capital needed to consumate the acquisition of the Innovex Group, Inc. in February of 2000, and (d) to sell their own shares in Citrix at artificially inflated prices during the Class Period.

18. During the Class Period, defendants sold thousands of Citrix shares at artificially inflated prices prior to the disclosure of the adverse information revealed to the public on June 12, 2000. For example, defendant Templeton exercised 20,000 options at $15.67 a share on December 1, 1999, which he sold the same day at $95.03 per share, reaping proceeds of over $1.5 million. On January 24, 2000, Templeton sold 17,738 shares at $148.89 per share - - well above the stock's current trading price of slightly over $20 per share - - reaping proceeds of an additional $2,641,011. On March 2, 2000, Templeton sold an additional 30,000 shares at $98.79 per share, resulting in nearly $3 million of proceeds. Defendant Iacobucci sold 200,000 of his own shares on February 6, 2000, generating proceeds of $32,900,000. Other Citrix insiders privy to the truth, such as the Company's former Chief Financial Officer James Felcyn Jr., also sold thousands of shares. Felcyn sold nearly 30,000 shares on November 30, 1999, reaping over $2.6 million.

19. The investing public was not as fortunate. While defendants timed their sales of Citrix stock to sell near the Company's Class Period highs, investors unaware of the Company's true financial condition purchased Citrix stock at artificially inflated prices. As a result of the fraudulent statements, the price of Citrix common stock reached over $181 per share on February 10, 2000. By the end of the Class Period on June 12, 2000, Citrix common stock was trading at less than $22 per share.

**NO SAFE HARBOR**

20. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. To the extent any of the specific statements pleaded herein were identified as "forward-looking statements", there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

21. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time of each of those forward-looking statements were made, the speaker knew that the particular forward-looking statement was false, and/or the forward looking statement was authorized and/or approved by an executive officer of Citrix who knew that those statements were false when made.

**APPLICABILITY OF FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE**

22. At all relevant times, the market for Citrix common stock was in an efficient market for the following reasons:

(a) Citrix common stock met the requirements for listing and was listed on the NASDAQ New Market system;

(b) As the Company registered pursuant to the provisions of the Exchange Act, Citrix filed periodic public reports with the SEC and the NASD and was subject to the requirements for providing timely and accurate information to the investing public pursuant to the rules and regulations of the SEC and the NASD;

        (c) Citrix regularly communicated with public investors, analysts and market professionals generally regarding the release of current information, and generally assured that information was released over major newswire services on a current basis;

23. The market price for Citrix common stock reflected the information publicly available about the Company, its results of operations and its potential products and development of those products throughout the Class Period. Thus, all purchasers of Citrix common stock during the Class Period are entitled to rely on the "fraud-on-the-market" doctrine which doctrine presumes reliance on the fraudulent statements alleged herein because the market price established in an open, developed and efficient market reflects those false and misleading statements. Accordingly, reliance on the false and misleading statements alleged herein is presumed.

**CLASS ACTION ALLEGATIONS**

24. Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who purchased the common stock of Citrix from October 20, 1999 through and including June 9, 2000 (the "Class Period"). Excluded from the Class are the defendants, members of the defendants' immediate families, their legal representatives, heirs, successors and assigns and any person acting in concert with or under the control of any defendant.

25. Members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class Members is unknown to plaintiff at the present time, plaintiff reasonably believes that there are hundreds, if not thousands, of members of the

Class throughout the United States. As of May 12, 2000, there were approximately 185 million shares outstanding of Citrix common stock. The members of the Class are geographically dispersed throughout the United States and can be determined by the records maintained by the transfer agent for Citrix.

26. Plaintiff's claims are typical of the claims of other Class Members because the damage suffered by plaintiff and all members of the Class arise from the same conduct. Specifically, plaintiff's claims and the claims of members of the Class arise out of the misrepresentations and omissions made by the defendants regarding the Company's operations and financial growth, as more fully alleged herein. Plaintiff has no claims which are antagonistic to, or in conflict with, the members of the Class.

27. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the common questions of fact are:

a) whether the federal securities laws were violated by reason of the false and misleading statements described herein;

b) whether defendants misrepresented or failed to disclose material facts regarding the true status of Citrix's business and operations as more fully particularized herein;

c) whether defendants are "controlling persons" as that term is defined in Section 20(a) of the Exchange Act;

d) whether the price of Citrix's common stock was artificially inflated during the Class Period due to the material misrepresentations and omissions complained of herein; and

e) whether the members of the Class have been damaged as a result of the conduct alleged herein and, if so, the proper measure of such damages.

28. Plaintiff will fairly and adequately protect the interests of other members of the Class, and plaintiff has retained counsel competent and experienced in class and securities litigation to prosecute the claims of the Class. Plaintiff intends to prosecute the claims asserted herein vigorously.

29. A class action is superior to the other available methods for the fair and efficient adjudication of this controversy. The Class is so numerous and geographically dispersed throughout the United States that it would be impractical for each member of the Class to bring separate actions or be joined in one individual action. In addition, the individual damages suffered by members of the Class may be relatively small when measured against the potential costs of bringing this action, thus, making the expense and burden of litigation appropriate for class action treatment. Also, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and possibly conflicting adjudications of the claims asserted herein.

30. There will be no difficulty in the management of this litigation as a class action. The names and addresses of record owners of the shares of the Company's common stock may be determined through the transfer agent, and notice can be provided to such persons through appropriate means of notice through publication, mailing and notices over business wire services

in a form similar to those customarily used in class action litigation arising under the federal securities laws.

**THE FALSE AND MISLEADING**
**STATEMENTS DURING THE CLASS PERIOD**

31. On October 18, 1999, the commencement of the Class Period, Citrix issued a press release announcing "record third quarter results." Net revenues for the third quarter of 1999 were $105.8 million, up 56% from the previous year. Net income, excluding certain write-offs, was $34.2 million, or $0.35 per share, as compared to $21.1 million or $0.23 per share, for the third quarter of 1998. Net income for the third quarter of 1999, including the effect of the write-offs, was $29.3 million, or $0.30 per share, compared with net income of $16.9 million, or $0.18 per share, for the third quarter of 1998. For the first nine months of 1999, net revenues were $285.2 million, a 65% increase for the comparable nine months of 1998.

32. Commenting on the seemingly stellar financial results, defendant Templeton stated:

> "We are pleased with our quarterly results which continue to demonstrate that our strategy of delivering server-based computing solutions is on track. As we grow our business and further establish ourselves as an enterprise software company, we plan to continue to deliver products which enable our customers to overcome technology churn and to cost-effectively deploy and manage their business applications without the constraints typically associated with traditional computing."

33. Defendants' financial results for the third quarter of fiscal year 1999 were repeated in its quarterly report on Form 10-Q for the period ending September 30, 1999, filed on November 15, 1999, and signed by defendant Templeton.

34. At the time of defendants' statements in the press release and quarterly report detailed above, Citrix stock traded at $80 per share, on November 15, 1999.

35. On January 19, 2000, defendants issued a press release reporting "record" results for fourth quarter and fiscal year 1999. Annual revenues grew 62% for the twelve months ending December 31, 1999. Net revenues for the fourth quarter of 1999 were $118.1 million, up 56% from $75.5 million in the comparable period of the prior year. Net income, excluding write-offs, was $37.7 million for the fourth quarter, or $0.38 per share, as compared with $24.7 million or $0.27 per share for the fourth quarter of 1998. Net income for the fourth quarter of 1999 was $34.0 million, including the effect of certain write-offs, or $0.34 per share, as compared with net income of $22.3 million, or $0.24 per share, for the fourth quarter of 1998.

36. For the year ending December 31, 1999, defendants announced net revenues of $403.3 million, up 62% from $248.6 million for 1998. Net income was $130.2 million, or $1.35 per share, compared to net income of $79.4 million, or $0.87 per share, for the comparable period in 1998. Net income for the year ending December 31, 1999 was $116.9 million, or $1.21 per share, compared to $61.1 million, and $0.67 per share, for 1998.

37. Commenting on the year-end results, defendant Templeton stated:

> "We believe these results represent an exceptional year for Citrix and one of the most exciting in the Company's ten year history. Moving forward, our goal remains the same - -bringing strategic value to the enterprise. In continuing to enable our customers and partners to effectively address needs, we will focus on adding new functionality to our current product line and developing winning new technologies - - from multi-media to Web solutions - -t hat optimize productivity and enhance business performance.

38. The Company also announced a two-for-one stock split payable in the form of a dividend on February 16, 2000, and the "extension" of its product line as well as

the growing acceptance of licensing to application service providers (ASP's). Defendant Iacobucci stated:

> "The growing acceptance of our ASP programme and the customer demand to port our products across other platforms such as UNIX are both indications that we are well positioned to actively address the challenges and opportunities associated with effectively using information in the new millennium."

39. In marked contrast to the Company's positive announcements concerning the Company's financial results and growth prospects, defendant Templeton, the Company's top-ranking officer, sold 67,738 shares between December 1, 1999 and March 2, 2000, generating proceeds of over $7 million dollars at artificially inflated prices ranging from $95.03 to $148.89 per share, prices well above the $22 per share price on June 12, 2000. Defendant Iacobucci sold 200,000 of his Citrix holdings, generating proceeds of $32,900,000.

40. On March 23, 2000, Citrix filed its annual report on Form 10-K for the year ending December 31, 1999, signed by defendants Templeton, Cunningham and Iacobucci. The annual report repeated Citrix's financial results as detailed in ¶¶ 35-38, above.

41. On March 24, 2000, Citrix stock traded at $90 per share. Had the truth concerning Citrix's true financial condition been known to investors at the time, Citrix stock would not have traded at such artificially inflated prices.

42. On April 19, 2000, defendants issued a press release reporting "record" first quarter 2000 financial results. Net revenues for the first quarter ending March 31, 2000 were $127.5 million, up 50% from 85.0 million in the comparable period of the prior year. Net income was $43 million for the first quarter, or $0.21 per share, compared to $28.2

Million or $0.15 per share for the first quarter of 1999. Net income for the first quarter of 2000 including the effect of certain write-offs, was $38.5 million or $0.19 per share, as compared with net income of $28.5 million or $0.14 per share for the first quarter of 1999.

43. In a section of the press release titled "Business Highlights", defendants stated:

> ***Three New Products Released*** - - Citrix launched MetaFrame for Windows 2000 Servers, MetFrame for the Solaris Operating System, and NFUSE, a new Web application portal, as part of extending these product lines into new markets.
>
> ***Strategic Acquisitions Announced*** - - Citrix acquired the Innovex Group to enhance its consulting service offerings for integrations partners and customers, and more recently, agreed to acquire India's PowerTel BOCA Ltd. to support growth in a key emerging market.
>
> ***ASP Market Leadership*** - - Citrix strengthened its position as an infrastructure leader in the application service provider (ASP) market with additional ASP's signing up for the Citrix ...programs.
>
> ***Improving Brand Awareness*** - - Citrix launched its "Digital Independence" branding campaign worldwide as part of raising the visibility of the Citrix brand in the marketplace.

44. On May 12, 2000, Citrix filed a quarterly report for the first quarter of fiscal year 2000, the period ending March 31, 2000. The report was signed by defendants Templeton and Cunningham. The report repeated the Company's earlier announced first quarter results, and added with respect to its international operations:

> International revenues accounted for approximately 39% of net revenues for the three months ended March 31, 2000 and March 31, 1999. The increase in international revenues was primarily due to the Company's increased sales and marketing efforts in Europe and Asia.

The quarterly report also represented that the Company's gross margins "increased...due to higher sales volumes and additional user licenses".

45. On May 12, 2000, Citrix stock traded at nearly $53 per share (after the Company's previously announced two-for-one stock split on February 17, 2000).

46. Defendants' statements detailed above in ¶¶ 31-33, 35-38, 40, and 42-44, were materially false and misleading. As detailed herein, defendants' numerous statements touting the company's increasing financial success failed to disclose the material adverse facts detailed in ¶ 47, below, facts which were necessary to reveal the Company's true financial condition to the investing public.

**The Truth Begins To Emerge**

47. On June 12, 2000, only one month after defendants' statements in ¶¶ 43 and 44 above touting the Company's expansion into new markets and stellar financial performance, defendants were forced to reveal that the Company's true financial condition was not as it had been represented. Defendants attributed the earnings shortfall to among other factors, a shift from "shrink-wrap box" licensing, in which programs are individually loaded onto computers, to "paper licensing" which delivers programs and upgrades electronically. Defendant Cunningham stated in a June 12, 2000 conference call, that Citrix would not be able to fully adjust spending to compensate for the delayed revenues. Defendants were also forced to admit that growth rates for the Company's gross margins were falling, contrary to the numerous Class Period representations touting the Company's phenomenal growth, increasing gross margins and entry into new markets. Defendants also admitted that, contrary to the statements regarding increased sales in Asia detailed in ¶ 44, above, the earnings shortfall was also attributable, in part, to *slower* expansion in Asia.

48. In response to defendants' announcement, that its second quarter sales and earnings will fall dramatically short of analysts' estimates, Citrix Systems shares were almost cut in half, dropping from over $41 per share on June 9, 2000, to slightly over $21 per share on June 12, 2000.

**FIRST CLAIM FOR RELIEF UNDER SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5**

49. Plaintiff repeats and realleges each and every allegation as if set forth in full herein.

50. Throughout the Class Period, defendants, singly and in concert, directly or indirectly, engaged in a common plan, scheme and course of conduct described herein, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon plaintiff and other members of the Class; made various false statements of material facts and omitted to stated materials to make the statements made not misleading to plaintiff and the other members of the Class; and employed manipulative or deceptive devices and contrivances in connection with the purchase and sale of Citrix stock.

51. The purpose and effect of defendants' plan, scheme, and course of conduct was to artificially inflate the price of Citrix stock and to artificially maintain the market price of Citrix securities.

52. Defendants, who include the top officer of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements

made by them or other Citrix personnel to the SEC, securities analysts and members of the investing public, including plaintiff and the Class.

53. As a result of the foregoing, the market price of Citrix securities was artificially inflated during the Class Period. In ignorance of the falsity of the reports and statements, and, the material misstatements by defendants regarding the financial condition and growth prospects of Citrix during the Class Period, and the deceptive and manipulative devices and contrivances employed by defendants, plaintiff and the other members of the Class relied, to their damage, on the reports and statements described above and/or the integrity of the market price of Citrix stock during the Class Period in purchasing Citrix common stock at prices which were artificially inflated as a result of defendants' false and misleading statements.

54. Had plaintiffs and the other members of the Class known of the material adverse information which defendants did not disclose, they would not have purchased Citrix common stock at the artificially inflated prices that they did.

55. Defendants' concealment of this material information served only to harm plaintiff and the other members of the class who purchased Citrix common stock in ignorance of the financial risk to them as a result of such non-disclosures.

56. As a result of the wrongful conduct alleged herein, plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

57. By reason of the foregoing, defendants have violated Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for the substantial damages which they suffered in connection with their purchase of Citrix common stock during the Class Period.

**SECOND CLAIM FOR RELIEF FOR VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT**

58. Plaintiff repeats and realleges each and every allegation set forth in full herein.

59. Defendants, by virtue of their office, directorship and specific acts were, at the time of the wrongs alleged herein, controlling persons of Citrix within the meaning of Section 20(a) of the Exchange Act. Defendants had the power and influence and exercised the same to cause Citrix to engage in the illegal conduct and practices complained of herein by causing the Company to disseminate to the public, or through analysts, the materially false and misleading information referred above.

60. Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from plaintiff and the Class by Citrix during the Class Period.

61. By reason of the conduct alleged in the First Claim for Relief, Defendants are liable for the aforesaid wrongful conduct and are liable to the plaintiff and the members of the Class for the substantial damages which they suffered in connection with their purchases of Citrix common stock during the Class Period.

**WHEREFORE**, Plaintiff, on his own behalf, and on behalf of the other members of the Class, pray for judgment as follows:

1) Declaring this action to be a proper class action, certifying the Plaintiff as a Class representative and his counsel as Class Counsel;

2) Declaring and determining that the defendants violated the federal securities laws by reason of their conduct as alleged herein;

3) Awarding money damages against the defendants, jointly and severally, in favor of the plaintiff and the other members of the Class for all losses and injuries suffered as a result of the acts and transactions complained of herein, together with prejudgment interest on all of the aforesaid damages which the Court shall award from the date of said wrongs to the date of judgment herein at a rate the Court shall fix;

4) Awarding plaintiff his costs and expenses incurred in this action, including reasonable attorneys', accountants' and experts' fees; and

5) Awarding such other relief as may be just and proper.

Dated: June 19, 2000.

**MILBERG WEISS BERSHAD HYNES & LERACH LLP**

**BY:** ____________________
Kenneth J. Vianale
E-Mail: kjv@mwbhlny.com
Fla. Bar No. 169668
Maya Saxena
Fla. Bar No. 0095494
E-Mail: ms@mwbhlny.com
5355 Town Center Road
Suite 900
Boca Raton, Florida, 33486
Tel:(561) 361-5000
Fax: (561) 367-8400

and

Steven G. Schulman
Samuel H. Rudman
One Pennsylvania Plaza
New York, NY 10119
Tel: (212) 594-5300
Fax: (212) 868-1229

**LAW OFFICES OF**
  **BRUCE G. MURPHY**
Bruce G. Murphy
265 Llwyds Lane
Vero Beach, FL 32963
Tel: (561) 231-4202
Fax: (561) 650-8213


**Attorneys for Plaintiff**

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

SEDDIQUE MATEEN ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|
| CTXS Common Stock | Purchased 100 shares | 6-9-00 | 41 1/4 |
| Common Stock | SOLD ~~Purchased~~ 100 shares | 6-15-00 | 23 1/4 |
| Common Stock | Purchased ____ shares | | |

5. During the three years prior to the date of this Certificate, Plaintiff has sought to serve or served as a representative party for a class in the following actions filed under the federal securities laws: (1) FPA MEDICAL MANAGEMENT INC SECURITIES LITIGATION, SO DIST OF CA (1998) (2) RED BRICK SYSTEMS, INC SECURITIES LITIGATION NO. DIST OF CA (1998).

6. The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable

costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 15 day of JUNE, ~~1999~~ 2000.

SEDDIQUE MATEEN

JS 44 (Rev. 12/96)

# CIVIL COVER SHEET

00-6839

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

CIV-FERGUSON

MAGISTRATE JUDGE SNOW

**(a) PLAINTIFFS**

SIDIQUE MATEEN, On Behalf of Himself and All Others Similarly Situated,

**DEFENDANTS**

CITRIX SYSTEMS INC., MARK B. TEMPLETON, JOHN P. CUNNINGHAM and EDWARD E. IACOBUCCI

U.S. DIST. CT. S.D. OF FLA.-FTL

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF: Martin
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT: Broward
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Kenneth J. Vianale 561-361-5000
MILBERG WEISS BERSHAD HYNES & LERACH LLP
5355 Town Center Road, Suite 900
Boca Raton, FL 33486

ATTORNEYS (IF KNOWN)
Unknown

(d) CIRCLE COUNTY WHERE ACTION AROSE: DADE, MONROE, (BROWARD), PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

**II. BASIS OF JURISDICTION** (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**V. NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

A CONTRACT: ☐ 110 Insurance; ☐ 120 Marine; ☐ 130 Miller Act; ☐ 140 Negotiable Instrument; ☐ 150 Recovery of Overpayment & Enforcement of Judgment; ☐ 151 Medicare Act; B ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans); B ☐ 153 Recovery of Overpayment of Veteran's Benefits; ☒ 160 Stockholders' Suits; ☐ 190 Other Contract; ☐ 195 Contract Product Liability

A REAL PROPERTY: ☐ 210 Land Condemnation; B ☐ 220 Foreclosure; ☐ 230 Rent Lease & Ejectment; ☐ 240 Torts to Land; ☐ 245 Tort Product Liability; ☐ 290 All Other Real Property

A TORTS — PERSONAL INJURY: ☐ 310 Airplane; ☐ 315 Airplane Product Liability; ☐ 320 Assault, Libel & Slander; ☐ 330 Federal Employers' Liability; ☐ 340 Marine; ☐ 345 Marine Product Liability; ☐ 350 Motor Vehicle; ☐ 355 Motor Vehicle Product Liability; ☐ 360 Other Personal Injury

PERSONAL INJURY: ☐ 362 Personal Injury - Med. Malpractice; ☐ 365 Personal Injury - Product Liability; ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY: ☐ 370 Other Fraud; ☐ 371 Truth in Lending; ☐ 380 Other Personal Property Damage; ☐ 385 Property Damage Product Liability

A CIVIL RIGHTS: ☐ 441 Voting; ☐ 442 Employment; ☐ 443 Housing/Accommodations; ☐ 444 Welfare; ☐ 440 Other Civil Rights

PRISONER PETITIONS: B ☐ 510 Motions to Vacate Sentence; HABEAS CORPUS: B ☐ 530 General; A ☐ 535 Death Penalty; B ☐ 540 Mandamus & Other; B ☐ 550 Civil Rights; B ☐ 555 Prison Condition

FORFEITURE/PENALTY: B ☐ 610 Agriculture; B ☐ 620 Other Food & Drug; B ☐ 625 Drug Related Seizure of Property 21 USC 881; B ☐ 630 Liquor Laws; B ☐ 640 R.R. & Truck; B ☐ 650 Airline Regs; B ☐ 660 Occupational Safety/Health; B ☐ 690 Other

A LABOR: ☐ 710 Fair Labor Standards Act; ☐ 720 Labor/Mgmt. Relations; ☐ 730 Labor/Mgmt. Reporting & Disclosure Act; ☐ 740 Railway Labor Act; ☐ 790 Other Labor Litigation; A ☐ 791 Empl. Ret. Inc. Security Act

A BANKRUPTCY: ☐ 422 Appeal 28 USC 158; ☐ 423 Withdrawal 28 USC 157

A PROPERTY RIGHTS: ☐ 820 Copyrights; ☐ 830 Patent; ☐ 840 Trademark

B SOCIAL SECURITY: ☐ 861 HIA (1395ff); ☐ 862 Black Lung (923); ☐ 863 DIWC/DIWW (405(g)); ☐ 864 SSID Title XVI; ☐ 865 RSI (405(g))

FEDERAL TAX SUITS: A ☐ 870 Taxes (U.S. Plaintiff or Defendant); A ☐ 871 IRS — Third Party 26 USC 7609

A OTHER STATUTES: ☐ 400 State Reapportionment; ☐ 410 Antitrust; ☐ 430 Banks and Banking; B ☐ 450 Commerce/ICC Rates/etc.; ☐ 460 Deportation; ☐ 470 Racketeer Influenced and Corrupt Organizations; ☐ 810 Selective Service; ☐ 850 Securities/Commodities/Exchange; ☐ 875 Customer Challenge 12 USC 3410; ☐ 891 Agricultural Acts; ☐ 892 Economic Stabilization Act; ☐ 893 Environmental Matters; ☐ 894 Energy Allocation Act; ☐ 895 Freedom of Information Act; ☐ 900 Appeal of Fee Determination Under Equal Access to Justice; ☐ 950 Constitutionality of State Statutes; ☐ 890 Other Statutory Actions; A OR B

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

15 U.S.C. § 78aa

LENGTH OF TRIAL via ___ days estimated (for both sides to try entire case)

**VII. REQUESTED IN COMPLAINT:** ☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint: JURY DEMAND: ☐ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See instructions): JUDGE Dimitrouleas DOCKET NUMBER 00-6796

DATE 6/19/00

SIGNATURE OF ATTORNEY OF RECORD: Maya Saxena

FOR OFFICE USE ONLY

RECEIPT # 519MOM AMOUNT $150.00 APPLYING IFP ___ JUDGE ___ MAG. JUDGE ___

06-19-00